IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Thomas F. Perrmann | : | Case No. 1:05-CV-633 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING AS MOOT |
| CF Industries, Inc., | : | MOTION TO DISMISS AND |
| | : | GRANTING MOTION FOR |
| Defendant. | : | SUMMARY JUDGMENT |

This matter comes before the Court on Defendant's Motion to Dismiss Plaintiff's ERISA Claim and Breach of Ohio Public Policy Claim Pursuant to Rule 12(b)(6) ("Motion to Dismiss") (doc. 6) and Defendant's Motion for Summary Judgment (doc. 17). Plaintiff Thomas F. Permann brings this action against his former employer, Defendant CF Industries, Inc. ("CFI"), alleging age discrimination in violation of federal and state statutory law and Ohio public policy, and alleging ERISA discrimination. CFI has filed a Partial Answer as to the statutory federal and state age discrimination claims, has moved to dismiss the Ohio public policy claim and the ERISA claim, and has moved for summary judgment as to all claims. For the reasons that follow, the Motion to Dismiss is **DENIED AS MOOT** and the Motion for Summary Judgment is **GRANTED**.

I.   BACKGROUND

The statement of facts is derived from CFI's Proposed Undisputed Facts (doc. 17 ex. H), the Perrmann's Response thereto (doc. 28), and the evidentiary materials cited therein. CFI is a national fertilizer manufacturer. CFI operates a dry fertilizer warehouse in Cincinnati, Ohio. CFI employs two management level employees at most warehouses, a superintendent with

1

overall responsibility for the location, and the supervisor under the superintendent. CFI also employs at each warehouse hourly employees called operators who are responsible for operating equipment and loading trucks and railcars with fertilizer.

Permann, who was born on December 12, 1954, began working as an operator for CFI at the Cincinnati warehouse part-time in 1975 and then full-time in 1977. CFI promoted Perrmann to the position of supervisor at the warehouse in March 1990. Perrmann remained a supervisor at that warehouse until his termination in September 2004. William Ritter (year of birth ("YOB") 1951) was the superintendent of the warehouse during the fourteen years that Perrmann was the supervisor.

On August 24, 2004, CFI held a cross-training meeting at the Cincinnati warehouse. Alan Kerns (YOB 1951), a regional manager, and Peter Dutchak (YOB 1955), Scott Dohmen (YOB 1964), and Robert Kipping (YOB 1958), superintendents for other terminals and warehouses, visited the Cincinnati warehouse for the meeting. Dutchak, Dohmen and Kipping met that evening for dinner. At dinner they discussed comments Perrmann and Kerns had made that day that they found to be vulgar and inappropriate. Dutchak, Domen and Kipping determined that they should report Perrmann's conduct to senior management. The following day, Dohmen reported the conduct to Brian Spencer, the general manager of CFI's distribution facilities, rather than to Dutchak's and Domen's supervisor, Kerns.

Spencer consulted with Ruth Rydzynski, the human resources advisor, and Lynda Streich, the director of professional development after talking to Dohmen. They agreed that Spencer would investigate the incidents reported by Dohmen by interviewing the people present during the events and report back to Rydzynski and Streich. Spencer then interviewed Dohmen,

Kipping, and Dutchak. Based on his interviews, Spencer believed the following events occurred:

- Perrmann responded to Kipping's inquiry at the start of the day about how his wife was doing day by stating, to paraphrase, "She's getting so fucking fat, all she does is sit at home on her fat ass, and I don't even call her a wife anymore."
- Dohmen heard Perrmann tell Kipping that Perrmann's wife was a "big fat bitch or hog or something . . . but it was just way out of line." Dohmen did not recall Perrmann's exact words.
- Kipping and Dohmen were shocked at Perrmann's words.
- Perrmann also spoke in a derogatory fashion about a regional manager who had been fired. Dohmen paraphrased Perrmann as having said "The dumb cocksucker comes down here and talks to me about my vulgarity; and yet look at that stupid cocksucker, he's the one that got fired." Kipping paraphrased Perrmann as having said "The stupid cocksucker came down here to Cincinnati to tell me to watch my mouth, and now two weeks later he's fired and I'm fucking still working. Who is the smart one out of the bunch?"
- Around lunchtime, Kerns asked Kipping, Perrmann, and Dohmen if they were going to take Lisa McQueen, a clerk in the warehouse and Perrmann's subordinate, to lunch with them. The men were standing in McQueen's area of work when the question was asked. Dohmen paraphrased Perrmann's response as having been "Are you fucking kidding me? We can't feed that fucking pig. She'd break our fucking checkbook." Kipping paraphrased Perrmann's response as having been "We're not taking that fucking hog to lunch. The last time I took her out to lunch, she broke my billfold. She eats too fucking much, and we cannot afford to pay for her." Kipping stated that McQueen looked shocked, but then "kind of smiled and seemed to me like she shook it off." Dohmen stated that McQueen quietly responded something to the effect that she could not help being a "big girl" and turned back to her computer.

Perrmann refutes these allegations. He denies making the above-paraphrased comments about his wife, the regional manager, and Lisa McQueen.

In regards to McQueen, Perrmann does admit to making a joke about McQueen and the way she eats. He admitted to saying about McQueen:

> And I make the joke, I said, oh, I says, I don't know if you want to offer to bring back Lisa anything for lunch. I said, Lisa can eat. I said, you know, and I'm – I was always joking. I said, I don't know if you have enough money in your wallet to pay for her lunch.

3

> * * * *
> I said, when we go out to eat, when me and Lisa have gone out to eat, I said, you might – I said, it might take two paychecks. I may have said at the end, I think I recall that I said, might take two paychecks to pay for her fucking lunch.

(Perrmann Dep. at 29-30.) Perrmann also points out that Spencer did not attempt to interview McQueen as part of his investigation. McQueen stated in her affidavit that she recalls Perrmann making a joke, but did not recall whether he used profanity. She stated further that she was not offended by what Perrmann had said.

Finally, although Kipping and Dohmen reported that they were stunned or shocked by Perrmann's comments, Dohmen also admitted that there was a little laughter in response to Perrmann's comments about McQueen and Kipping stated that he "laughed, [he] was shocked."

Also, Spencer and Rydzynski interviewed Kerns about the August 24, 2004 incidents. Rydzynski testified that Kerns stated that he heard Perrmann make the "cocksucker" comment about the regional manager. This fact is disputed, however, because Kerns denies in his affidavit that he heard Perrmann make such a statement.

Finally, Spencer consulted with William Eppel, CFI's vice president for human resources, John Sultenfuss, CFI's executive vice president and chief operating officer, and Steve Wilson, CFI's president and chief executive officer, about Perrmann's conduct. However, as Perrmann points out, Spencer did not interview him, Ritter, the Cincinnati warehouse superintendent and Perrmann's supervisor, nor McQueen during his investigation. CFI states that Spencer did not interview Ritter because he was not present at the time of the alleged incidents and did not interview McQueen because he did not believe that CFI should wait for a complaint before responding to what it perceived to be egregious behavior.

In the course of his investigation, Spencer also learned that Perrmann's supervisor,

4

Kerns, had made a vulgar sexual statement and action while holding a bottle of hot sauce on the day in question.

Spencer ultimately recommended that CFI terminate Perrmann for gross misconduct and violation of CFI's harassment policy by a management member.  Eppel and Sultenfuss approved the recommendation to terminate Perrmann.  CFI terminated Perrmann's employment effective September 13, 2004.  Ritter, Perrmann's immediate supervisor, testified that he was "surprised" and "unhappy" about Perrmann's termination.

CFI replaced Perrmann as supervisor of the Cincinnati warehouse with Arnold Fausett (YOB 1960).  CFI also terminated Kerns on the basis that he failed as a regional manager by permitting Perrmann's conduct and for engaging in improper conduct himself.

During his employment as a supervisor at CFI, Perrmann was responsible, in part, for administering CFI's practices and procedures.  CFI had a written harassment policy in effect in August and September 2004.  The harassment policy forbid harassing behavior such as making demeaning, lewd or other offensive personal comments.  The policy authorized immediate disciplinary action against any harassing employee up to and including termination.  Perrmann admits that he was aware of the policy and that he received sexual harassment training at CFI.

CFI's HR Management Guide Performance Improvement/Discipline ("Guide") was also in effect in August and September 2004.  The Guide set forth a multi-step procedure to handle work rule violations, modify unacceptable behavior, and improve employee performance. However, the Guide also stated that "some actions are considered so serious that the normal positive discipline procedure does not apply and crisis suspension or immediate termination may result" and that an employee may be discharged where "the incident is of such major

consequence that the employee forfeits the Positive Discipline process."

CFI has terminated three other employees for violation of its harassment policy. Two operators, James Joyce (YOB 1964) and Paul Gehle (YOB 1970), were discharged in October 2005 for violating the harassment policy when they used profanity over a two-way radio at work. CFI terminated another operator, David Cook (YOB 1967), in March 2002 for sexual harassment.

Perrmann, for his part, contends that the harassment policy was not consistently applied or enforced. Perrmann testified that he had not been disciplined verbally or otherwise by CFI regarding his language prior to the incidents at issue. Rydzynski stated that there were no written warnings in Perrmann's file. Perrmann also cites to the depositions of Spencer, Ritter, Kipping, and Dohmen that they had used and/or had heard others use profanity on the job at CFI. Perrmann testified that he was told by Ritter that Pete Minwegan, a CFI employee who was in charge of nitrogen distribution and worked out of the Long Grove office, that if Perrmann was "terminated for what [he] heard he was terminated for, half the people in this Long Grove office would be fired." Perrmann also cites to Kerns' testimony that Kipping and Dohmen did not appear shocked or outraged by Perrmann's comments when he made them.

Moreover, Perrmann asserts that he should have been given progressive discipline pursuant to the Guide. Regarding the terminations of Joyce, Gehle, and Cook for harassment, Perrmann points out that CFI issued warnings to each of the operators concerning their behavior before they were discharged. Perrmann also states that four other employees, Tony Moshak (YOB 1962), Bill Hess (YOB 1953), Eric McCorvey (YOB 1970), and Tom Jaehnen (YOB 1963) were treated better than he was under the CFI's progressive disciplinary guidelines. Hess,

McCorvey, and Jaehnen work or worked as operators in the Cincinnati warehouse. Each was counseled and/or were given written warning for behavior or performance issues. The fourth employee, Moshak, worked in technology services at a Terre Haute, Indiana worksite under a different supervisor than Perrmann. Perrmann does not know if Moshak was disciplined for his behavior, which included drunkenness.

Additionally, Perrmann provides as evidence a personnel requisition form for the position of Cincinnati warehouse supervisor, Perrmann's position, with a typed date in the left-hand corner of "6/1/04." Perrmann contends that the requisition form proves that CFI intended to terminate him as early as June 1, 2004, almost three months before the August 24, 2004 incidents occurred. In response, CFI relies on Rydzynski's testimony that the 6/1/04 date is a typographical error. CFI's argument is supported by the fact that Brian Spencer did not sign the requisition form until September 10, 2004 and that two other human resources employees did not sign the form until September 13, 2004 and September 24, 2004, respectively, all of which dates were after Perrmann allegedly made the offensive remarks.

Finally, Perrmann cites testimony of Ritter, the Cincinnati warehouse superintendent that Fausett, Perrmann's immediate replacement, was not qualified for the position of warehouse supervisor. Ritter retired in July 2006 and his retirement was expected. Fausett is now the superintendent and Darryl Moore, a former operator in his mid-30's, is the supervisor at the Cincinnati warehouse.

## II.   ANALYSIS

### A.   Motion to Dismiss

CFI moved to dismiss Perrmann's ERISA claim and breach of public policy claim

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court did not rule on the Motion to Dismiss before parties had fully briefed the Motion for Summary Judgment. Because the issues and arguments in the dismissal motion and the summary judgment motion overlap, the Court will **DENY AS MOOT** the Motion to Dismiss.

**B.     Motion for Summary Judgment**

**1.     Standards Governing Motions for Summary Judgment**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the moving party has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

The moving party may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

### 2. Public Policy Claim

Perrmann alleged in his Complaint that CFI discriminated against him on the basis of his age in violation of Ohio public policy. CFI moved to dismiss the claim, and for summary judgment, on the grounds that Ohio does not recognize a public policy claim for age discrimination. Perrmann now has stated that he does not oppose CFI's motions as to this claim. (Doc. 27 at 1, n.1; doc. 28 at 4, ¶¶ 66-67.) The Court **GRANTS** summary judgment to CFI as to the Ohio public policy claim.

### 3. Statutory Age Discrimination Claim

Perrmann alleges age discrimination and asserts that his termination violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Ohio Revised Code § 4112.14. Because Ohio Revised Code §4112.14 parallels the federal discrimination statues, the Court analyzes the age discrimination claim under the ADEA. Ercegovich v. Goodyear Tire and Rubber Co., 154 F.3d 344, 357-58 (6th Cir. 1998); Whitt v. Lockheed Martin Utility Serv., Inc., 209 F.Supp.2d 787, 792 (S.D. Ohio 2002); Plumbers and Steam Fitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 132 (1981). However, the Court is cognizant that the Ohio courts do not consider themselves bound in all situations by federal caselaw when interpreting and applying Ohio discrimination laws. Coryell v. Bank One Trust Co. N.A., 101 Ohio St.3d 175, 179, ¶ 15, 803 N.E.2d 781, 786 (2004).

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge

any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). To establish a claim under the ADEA, a plaintiff-employee must show that "the protected trait (under the ADEA, age) actually motivated the employer's decision"–that is, the employee's protected trait must have "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)). The plaintiff may prove such a claim with direct evidence of the employer's discriminatory motive, or by the indirect, burden-shifting approach articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[1] Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th Cir. 2004). Perrmann presents no direct evidence that CFI unlawfully discriminated against him on the basis of his age, and thus he must rely on the indirect method.

Under the McDonnell Douglas analysis, a plaintiff must first prove a prima facie case of age discrimination. Rowan, 360 F.3d at 547. If the plaintiff meets his burden, then the employer must assert a nondiscriminatory reason for its employment decision. Id. (citing LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 379 (6th Cir.1993)). If the employer satisfies this burden of production, then the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason was not its true reason but was, in fact, a pretext for decisions

---

[1] The Supreme Court has assumed that the McDonnell Douglas burden-shifting framework applies to age-discrimination cases. O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996).

actually motivated by unlawful bias against age. Id.

To establish a prima facie case of age discrimination in relation to a termination of employment, a plaintiff must show (1) that he was a member of a protected age class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position he held; and (4) that he was replaced by a younger worker or was treated differently than similarly situated younger employees. Bender v. Hecht's Dept. Stores, 455 F.3d 612, 620 (6th Cir. 2006) (citing Cox v. DOT, 53 F.3d 146, 150 (6th Cir.1995)); Cichewicz v. UNOVA Indus. Automotive Systems, Inc., No. 02-1831, 2004 WL 291178, *2 (6th Cir. Feb. 12, 2004).

Following this analytical framework, the Court first examines whether Perrmann can establish his prima facie case. The first and second elements are not disputed. Perrmann was more than forty years of age at the date of his termination and termination is an adverse employment action. As to the third element, Permann had held the position of warehouse supervisor for fourteen years prior to his termination. CFI does not challenge Perrmann's qualification for the position other than to point to the alleged conduct that led to his termination. The Court concludes that a reasonable jury could find that Perrmann was qualified for his position.

CFI contends that it is entitled summary judgment because Perrmann cannot prove the fourth element of his prima face case, that he was treated differently than similarly situated employees or that he was replaced by a significantly younger employee. Generally, courts in the Sixth Circuit require that the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects" to be considered similarly situated. Ercegovich, 154 F.3d at 352. For example, in cases involving disciplinary

11

action, the plaintiff and the other employee generally must have dealt with the same supervisor, been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct. Id.

Perrmann states that James Joyce (YOB 1964), Tony Moshak (YOB 1962), Bill Hess (YOB 1953), Eric McCorvey (YOB 1970), Tom Jaehnen (YOB 1963), Paul Gehle (YOB 1970) and David Cook (YOB 1967) were similarly situated employees who were treated better than he was under the CFI's progressive disciplinary guidelines. Bill Hess is older than Perrmann and a comparison with how he was treated cannot help establish Perrmann's prima facie case. Of the others, Joyce, McCorvey, Jaehnen, Gehle and Cook, work or worked as operators in the Cincinnati warehouse. They were each counseled and/or were given written warning for behavior or performance issues. However, as hourly wage operators, these purported comparables did not serve in a managerial position as Perrmann did. Moreover, they were not under the supervision of the same supervisor as Perrmann. In fact, Perrmann is the supervisor who counseled Joyce and Jaehnen. As to McCorvey, he was issued a warning and placed on leave for performance issues (*i.e.*, making mistakes), not for a behavioral issue (*i.e.*, using vulgar language). Applying Ercegovich, the Court finds as a matter of law that Perrmann, a warehouse supervisor who was responsible for enforcing CFI policies and procedures, including the non-harassment policy, was not similarly situated to the non-managerial warehouse operators to whom he seeks to compare himself.

Another employee to whom Perrmann compares himself, Moshak, worked in technology services at a Terre Haute, Indiana worksite under a different supervisor than Perrmann. Moshak's behavior issues included drunkeness and arriving late at a meeeting. Perrmann does

12

not know if Moshak was disciplined for his behavior. The Court finds that Moshak was not similarly situated to Perrmann as a matter of law because they held different positions, worked under different supervisors, and worked in different offices, and because Perrmann does not know whether Moshak was disciplined or how.

Perrmann also points to Scott Dohmen (YOB 1964) and Robert Kipping (YOB 1958), who were managers, as people who were similarly situated to him. Perrmann relies on the fact that they admitted to using profanity at work, but were not terminated.[2] Without more evidence, the Court cannot determine that Dohmen and Kipping were similarly situated for the purposes of establishing a prima facie case. Examining the evidence in a light most favorable to Perrmann, and assuming that Perrmann only made the isolated comment to McQueen in which he used a profanity while insulting her eating habits, the Court cannot compare his conduct to that Dohmen or Kipping. The Court does not know the type of profanities that Dohmen or Kipping used, whether their profanities were directed at or used to insult another person, whether their uses of profanity were isolated occurrences, the circumstance in which they uttered the profanities, or the audience for the profanities. For the same reason, Pete Minwegan's non-specific comments about vulgarities being used in the Long Grove office are not probative on this issue. In sum, the Court finds that Perrmann has not put forward sufficient evidence to establish that similarly situated younger employees were treated better than he was.

As to whether Perrmann was replaced by a younger worker, it is undisputed that CFI placed Arnold Fausett (YOB 1960) in the Cincinnati warehouse supervisor position after

---

[2] He also states that Spencer (YOB 1951) and Ritter (YOB 1951) used profanity at work, and that Spencer was not disciplined or terminated for use of profanity. However, Spencer and Ritter are older than Perrmann so that fact does not aid Perrmann's case.

Perrmann was fired. Fausett served as supervisor until July 2006 when he became the warehouse superintendent after Ritter retired.[3] Fausett is only six years younger than Perrmann and he was over the age of forty when he replaced Perrmann. When an age discrimination plaintiff is replaced by a worker also in the protected age group, he can prove his prima facie case if he establishes that he was replaced by a "significantly younger worker." Grosjean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir. 2003). In Grosjean, the Sixth Circuit examined law from within the Circuit and from other Circuits regarding how many years constituted a substantial age difference. The Sixth Circuit held that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." Id. at 340. Contrary to Perrmann's counsel's argument, this is a "bright line rule" which this Court cannot ignore here. Williams v. Tyco Elec. Corp., 161 Fed. Appx. 526, 536 (6th Cir. 2006). Fausett is only six years younger than Perrmann, and Perrmann does not offer additional evidence that CFI considered age to be significant. The Court finds as a matter of law that Perrmann was not replaced by a significantly younger worker for purposes of the ADEA.

The Ohio Supreme Court, however, has not explicitly adopted the Grosjean six years or less standard for purposes of determining what qualifies as "substantially younger" when the plaintiff and his replacement are both in the protected age class, *i.e.* over the age of forty. In a post-Grosjean case, the Ohio Supreme Court stated that it had not defined and would not define at that time the term, "substantially younger." Coryell, 101 Ohio St. 3d at ¶ 22. Instead, the

---

[3] Under the facts in evidence here, the fact that Fausett was replaced in the supervisor position by a worker in his mid-30's almost two years after he replaced Perrmann is irrelevant to Perrmann's prima facie case.

14

Ohio Supreme Court instructed that the focus of the entire prima facie inquiry is to determine whether an inference of age discrimination can be found. Id. The Ohio Supreme Court purported to find support for its position from a review of federal caselaw, but it did not cite the Grosjean standard or even acknowledge the case. Thus, the six years or less standard is not a bright line law for purposes of the Ohio age discrimination statute. Nonetheless, at least one district court, after Coryell and Grosjean, applied the six years or less standard of Grosjean to claims arising under both federal and Ohio law. Van Diest v. Deloitte & Touche, LLP, No. 1:04CV2199, 2005 WL 2416921, *6 (N.D. Ohio Sept. 30, 2005). Plaintiff has pointed to no cases in which a court has held that an age difference of six years or less is substantial under Ohio law. The Court holds that Fausett was not substantially younger than Perrmann for purposes of Ohio law either.

Finally, having reviewed all the material evidence, the Court finds that no reasonable jury could conclude based on the direct or circumstantial evidence that CFI was motivated by Perrmann's age when it made the decision to terminate his employment. Accordingly, Perrmann has failed to establish a prima facie case of age discrimination.[4] The Court **GRANTS** summary judgment to CFI on Perrmann's statutory age discrimination claims.

**4.     ERISA Claim**

Perrmann was a participant in an employee benefits plan at CFI governed by ERISA. In Count IV of the Complaint, Perrmann alleges that CFI knowingly terminated him to avoid the vesting of his benefits in violation of ERISA § 510, 29 U.S.C. § 1140. ERISA § 510 makes it

---

[4] Because Perrmann cannot establish his prima facie case, the Court need not and does not consider whether Perrmann has sufficient evidence to establish that CFI's stated non-discriminatory reason for terminating him was mere pretext for age discrimination.

unlawful to discriminate against or terminate an ERISA plan beneficiary or participant "for exercising any right to which he is entitled" under the ERISA plan or "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. Perrmann now concedes that his benefits have vested in the plan, but he maintains his claim for the accrual of future benefits. CFI originally moved to dismiss on the basis that Perrmann failed to exhaust his administrative remedies. However, CFI has withdrawn this argument now that it is plain that Perrmann's ERISA claim is for discrimination pursuant to section § 510, not for benefits pursuant to ERISA § 502, 29 U.S.C. § 1132.

To prove ERISA discrimination, Perrmann must prove that CFI had a "specific intent to violate ERISA." Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1113 (6th Cir. 2001). Perrmann does not present direct evidence that CFI had a specific intent to violate ERISA. In the absence of that evidence, he can establish a prima facie case of discrimination indirectly by proving the following elements: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Id. at 1114. In other words, Perrmann must come forward with evidence to establish that avoiding ERISA liability was a "determining factor" in CFI's decision to discharge him. Id.

Perrmann admits that the sole basis for his claim is that "by virtue of his termination, he would not get future benefits." (Doc. 17 ¶ 62; doc. 28 ¶ 62.) He points to evidence that his pension benefits would have increased as he accrued additional years of service and a higher rate of pay if he had not been terminated. Perrmann's evidence at most shows that lower pension benefits were a result of CFI's decision to terminate him. Without additional evidence, the Court cannot infer specific intent to violate ERISA from mere fact that Perrmann's termination

adversely affected the amount of his future benefits. Perrmann's evidence does not establish directly or indirectly that the payment of lower pension benefits was a motivating cause for his termination. If Perrmann could establish ERISA liability on these facts, then any employer who provides ERISA benefits would face an ERISA § 510 discrimination claim every time the employer fired a participant employee, no matter the reason for the termination. Majewski, 274 F.3d at 1113; Bingaman v. Procter & Gamble Co., No. 04-3584, 2005 WL 1579703, *8 (6th Cir. July 6, 2005). In conclusion, the Court **GRANTS** summary judgment to CFI on Perrmann's ERISA claim because no reasonable jury could conclude that CFI acted with a specific intent to violate ERISA.

### III. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss Plaintiff's ERISA Claim and Breach of Ohio Public Policy Claim Pursuant to Rule 12(b)(6) (doc. 6) is **DENIED AS MOOT** and Defendant's Motion for Summary Judgment (doc. 17) is **GRANTED**.

IT IS SO ORDERED.

                                                                                                     s/Susan J. Dlott
                                                                                                     Susan J. Dlott
                                                                                                     United States District Judge